UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/17/06

-----------------------------------------x

SECURITIES AND EXCHANGE
COMMISSION                            :
                                      :
                                      :
                    Plaintiff,        :      04 CV 2324 (TPG)
                                      :
                                      :
        - against -                   :         **OPINION**
                                      :
CEDRIC KUSHNER PROMOTIONS, INC.,      :
CEDRIC KUSHNER, JAMES DILORENZO       :
AND STEVEN ANGEL,                     :
                                      :
                                      :
                    Defendants.       :
-----------------------------------------x

In this action, the Securities and Exchange Commission ("SEC")
asserts various securities law violations in connection with defendant
Cedric Kushner Promotions Inc.'s ("CKP") filing of its Form 10-KSB on
May 20, 2003 and Form 10-KSB/A on May 23, 2003. In November 2005,
defendants Cedric Kushner Promotions, Inc. and Cedric Kushner settled
with the SEC. A trial with respect to the claims against defendants
James DiLorenzo and Steven Angel is currently scheduled for March 13,
2006. However, Angel has now moved for summary judgment on all
counts. The motion is granted.

Cedric Kushner Promotions, Inc., a corporate promoter of boxers
and boxing matches, is a public company with shares traded on the
NASDAQ Over-the-Counter Bulletin Board ("OTCBB"). CKP had a board
of directors composed of three persons, Cedric Kushner, CKP's Chief

Executive Officer, James DiLorenzo, CKP's Executive Vice President, Treasurer, and principal Financial and Accounting Officer, and defendant, Steven Angel.

On May 20, 2003, CKP filed its 2002 Form 10-KSB with the SEC. The form contained a number of misrepresentations and omissions including incorrect statements of CKP's cash flows, operating expenditures, and number of shares outstanding. The Form 10-KSB also contained audit reports that had been included by CKP without the consent of its auditors, and had computer signatures of the auditors which were, in effect, forged. Three days later, on May 23, 2003, CKP filed a Form-10-KSB/A, amending its original Form 10-KSB. The Form 10-KSB/A also contained various misrepresentations and omissions.

The central issue in this case is whether Angel may be held liable under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 CFR § 240.10b-5, as a primary violator, an aider of abettor, or not at all.

The complaint also asserts claims against Angel for aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m (a), (b)(2)(A), (b)(2)(B), and Rules 13a-1 and 12b-20 thereunder, 17 CFR §§ 240.13a-1, 12b-20.

The SEC seeks monetary penalties, and an injunction permanently restraining Angel from violating various securities laws. The SEC also requests an order, pursuant to Section 21(d) of the Exchange Act, 15

U.S.C. § 78u(d), permanently barring Angel from serving as an officer or director of any public company.

Although the complaint contains allegation with respect to both the May 20 and May 23 filings, the presentations on Angel's motion for summary judgment clearly indicate that the SEC is seeking to hold Angel liable only for the May 20 filing. The SEC has not made any factual submission regarding Angel's role in the May 23 filing. Any claims with respect to the May 23 filing are therefore deemed abandoned.

## FACTS

The following facts are undisputed. CKP's 2002 Form 10-KSB was originally due for filing on March 31, 2003. On March 26, 2003, CKP engaged Yeend & Castaneda, an accounting and financial services firm, to assist BDO Seidman, the company's outside auditor in the preparation of its 2002 Form 10-KSB. John Yeend, a principal at Yeend & Castaneda, had been the Chief Financial Officer of CKP from April through September of 2002. Yeend and his associate at Yeend & Castaneda, Muhammad Khan, worked closely with CKP and CKP's auditors in preparing the filing. Yeend & Castaneda were, in effect, CKP's "inside" accounting staff.

On March 31, 2002, CKP obtained a 15-day extension, allowing it to file the form on April 15, 2003. On April 2, 2003, BDO Seidman

resigned as CKP's outside auditor, but agreed to review and consent to certain 2001 financial statements that it had previously audited, and that were to be included in the 2002 Form 10-KSB. The following day, CKP retained Marcum & Kliegman as replacement outside auditor. David Bukzin was the partner in charge of the CKP audit.

CKP missed the April 15, 2003 deadline and, on April 20, 2003, the OTCBB changed CKP's ticker symbol from "CKHP" to "CKHPE" signifying that it was a late filer. CKP was then informed by its outside counsel that unless it filed its Form 10-KSB with the SEC within thirty days from April 20, 2003 – by May 20, 2003 at 5:30 p.m. – CKP would be de-listed from the OTCBB.

Angel was examined by SEC attorneys on June 27, 2003. He was questioned thoroughly about his background and about his role in the May 20 filing. At the oral argument of the present motion for summary judgment, the SEC conceded the truth of Angel's testimony. The following facts consist of a summary of the important parts of that testimony unless otherwise noted.

Steven Angel is 29 years old. Angel became a director at CKP when, on April 30, 2002, Zenascent, Inc., the company at which he had previously served as director, merged with Cedric Kushner Boxing, Inc. to form CKP. Angel was retained as a director after the merger primarily to represent the interests of former Zenascent shareholders. Angel was not an officer of CKP, but was employed as a consultant to CKP, a role in

which he was subordinate to Kushner, CKP's Chief Executive Officer, and DiLorenzo, its Chief Financial Officer.

On May 20, 2003, at approximately 1:30 a.m., David Bukzin, the partner at Marcus & Kliegman working on the CKP audit, called Yeend, DiLorenzo, and Kushner, to inform them that there were still some "open issues" and missing documentation that might prevent completion of their audit by the 5:30 p.m. deadline. They then called Angel at his home. Angel agreed to go immediately to the office to locate the required documents necessary to close these remaining open items. Angel arrived at the office at approximately 2:00 a.m. and worked through the night. At approximately 7:00 a.m., Angel obtained the last item on his list, a litigation document, which he then faxed to Yeend & Castaneda and Marcum & Kliegman.

Angel played a "very background role" in the preparation of the Form 10-KSB. Angel was not involved in the preparation of the financial or accounting statements that were contained in the Form 10-KSB, which are the portions of that form alleged to contain the false and misleading statements. Rather, Angel's role was strictly limited to providing Yeend & Castaneda and Marcum & Kliegman with "paper work backup" documentation necessary to cross items off the list of "open items," and answering questions about subsequent events and pending litigation against CKP.

Angel testified that requests for backup documentation to close the open items would be relayed from Marcum & Kliegman to Yeend & Castaneda, who in turn would request those items from Angel. Angel would then locate the necessary documents and fax them to both parties. Yeend & Castaneda was the party responsible for the financial and accounting statements that were the heart of the filing.

During the days leading up to the May 20 filing deadline, Yeend & Castaneda periodically circulated drafts of the Form 10-KSB to CKP's principals, including Angel. Angel reviewed only the portion of these drafts which were related to his open items, and never reviewed any of the financial statements contained in the drafts.

At approximately noon on May 20, Angel participated in a conference call with Bukzin and CKP's counsel, Greg Sichenzia. During this conversation, Sichenzia warned Bukzin and Angel that the company would be delisted from the OTCBB if it did not file by 5:30 p.m. that evening. Later that afternoon, Angel performed his last task in connection with the Form 10-KSB, which was to confirm that Yeend & Castaneda and Marcum & Kliegman were in touch with Richard Hausig at MDM Filings, the individual responsible for converting the draft Form 10-KSB into a format suitable for electronic filing with the SEC.

Although it was not raised during Angel's examination, the parties agree that at some point during the afternoon on May 20, Angel delivered a draft version of CKP's 2002 Form 10-KSB to Kushner together with

several blank signature pages for Kushner's execution. This was a purely ministerial task. Both Kushner and Angel have stated that at the time Angel gave those documents to Kushner, Kushner understood that the document was not yet finalized and that those pages would be held in reserve until such time as CKP's accountants and auditors had finalized the Form 10-KSB and authorized its filing with the SEC. Angel did not make any representations to Kushner regarding the accuracy or completeness of the draft Form 10-KSB at the time he gave it to Kushner.

By 6:00 p.m. that evening, Marcum & Kliegman had not completed its review, and it appeared that CKP was going to miss the 5:30 p.m. filing deadline. Angel, having been in the office since 2:00 a.m., left the office at approximately 6:00 p.m. to return home. Despite having missed the 5:30 p.m. filing deadline, Yeend, Bukzin, and DiLorenzo decided to attempt to complete the form by 10:00 p.m. when the SEC's electronic filing system stopped accepting filings for the night. After leaving the office at 6:00 p.m., Angel had no further involvement in the preparation or filing of CKP's Form 10-KSB.

Upon returning home, Angel received an email that had been sent to him and DiLorenzo by Bukzin at 6:46 p.m. that evening. The email stated that Marcum & Kliegman had "not had the opportunity to review the latest draft of your Form 10-KSB and as such we are not in a position to authorize the filing with the inclusion of our audit opinion."

At some point thereafter (Angel is unsure of the exact time), Angel called DiLorenzo who assured him that the "email wasn't an issue." During this conversation, DiLorenzo told Angel that the email was no longer relevant because he had been in regular communication with Bukzin, and believed that CKP had Marcum & Kliegman's permission to file.

DiLorenzo gave the final approval to file CKP's 2002 Form 10-KSB with the SEC at approximately 9:43 p.m. The form contained unauthorized computer signatures of both of CKP's auditors, Marcum & Kliegman and BDO Seidman.

The form was signed by Kushner and DiLorenzo. Angel did not sign the form. At 9:52 p.m., Yeend sent Angel an email with the final filed version of the form attached.

The following day, both BDO Seidman and Marcum & Kliegman contacted CKP and stated that the Form 10-KSB failed to incorporate necessary changes and corrections they had given to CKP and Yeend & Castaneda, and had been filed without their consent. BDO Seidman's letter threatened that if an amended filing was not made by May 22, 2003, it would notify the SEC that BDO Seidman's opinion was filed without its consent. Bukzin, too, sent a letter to Kushner demanding that CKP advise Marcum & Kliegman's counsel in writing what steps CKP would take to correct the mistakes, and the time frame for doing so. At 9:00 p.m. on May 21, Angel forwarded a letter from Kushner to Bukzin

addressing "how we intend to proceed." The letter stated that CKP had prepared, and would file an amended Form 10-KSB/A.

All this led to the May 23 filing which is not relevant to Angel's motion for summary judgment.

## DISCUSSION

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the court concludes that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,' and summary judgment must be granted. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and draw all permissible inferences in favor of that party. Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997). The Court must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 254-57 (1986). Thus, "conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

The complaint contains three counts against Angel. Count I of the complaint alleges a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Count II alleges an aiding and abetting violation of Section 10(b) and Rule 10b-5. Count V alleges aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act.

## Count I: Primary Violation of Exchange Act Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act provides, in pertinent part:

> It shall be unlawful for any person . . . (b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

SEC Rule 10b-5 implements Section 10(b). The relevant portion of the rule makes it unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

In order to be held liable for a primary violation of Section 10(b) and Rule 10b-5, as distinct from aiding and abetting[1] such a violation, defendant must have (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. Securities Exch. Comm'n v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999).

In Wright v. Ernst & Young LLP, 152 F.3d 169 (2d Cir. 1998), the district court had dismissed a complaint alleging that the accounting firm Ernst & Young approved, although it did not audit, certain false or misleading financial statements of BT Office Products, Inc., which that company had then disseminated to the public in a press release. The press release stated that the figures it contained were unaudited and did not mention Ernst & Young. The plaintiffs sought to hold Ernst & Young primarily liable under Section 10(b) on the theory that it had in effect made the false statements because it had assured BT of the accuracy of its financial reports knowing that BT would, in turn, promptly disseminate those results to investors in the press release." Id. at 173. Plaintiffs also argued in the alternative, that even if Ernst & Young's alleged conduct did not amount to a false statement, Ernst & Young should nevertheless be held primarily liable because it "substantially participated" in the fraud. Id.

---

[1] There will be a discussion of the developments in the law regarding aiding and abetting later in this opinion.

The Court of Appeals rejected both arguments and affirmed the dismissal of the complaint. The court noted that there is no requirement that the alleged violator directly communicate misrepresentations to investors for primary liability to attach. The court recognized that a misrepresentation can be indirectly communicated. However, this cannot occur unless a statement is at least attributed to the party sought to be held responsible. Id. at 175. The court held that Ernst & Young had neither directly nor indirectly communicated a misrepresentation to investors, basing the latter finding on the fact that there had been no attribution to Ernst & Young in the press release. Id.

The Court of Appeals also rejected the plaintiffs' alternative argument that Ernst & Young could be held primarily liable for its "substantial participation" in the fraud. The court reaffirmed the "bright line" test for Section 10(b) primary liability it had formulated in Shapiro v. Cantor, 123 F.3d 717 (2d Cir. 1997):

> A defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b).

Wright, 152 F.3d at 175. See also SEC v. PIMCO Advisors Fund Mgmt. LLC, 341 F. Supp. 2d 454, 465 (S.D.N.Y. 2004).

The SEC argues in the present case that the bright line rule announced in Wright is no longer good law, relying primarily on In re Scholastic Corp., 252 F.3d 63 (2d Cir. 2001). It is true that Scholastic does not explicitly use the label "bright line," and does not cite Wright. However, Scholastic offers no departure from the substance of the decision in Wright.

In Scholastic, the action was brought against the company, Scholastic Corp., and also against Marchuk, Scholastic's vice president for finance and investor relations. The complaint alleged that these defendants disseminated, in various forms, false financial information. Id. at 69. The district court dismissed the complaint. The plaintiffs appealed.

The only issue on appeal that is relevant to Angel's motion in the present case relates to Marchuk's liability. Marchuk contended that the alleged fraudulent and misleading statements attributable to Scholastic Corp. had not been made attributable to him. However, the Court of Appeals characterized the claims against Marchuk as follows:

> Marchuk was primarily responsible for Scholastic's communications with investors and industry analysts. He was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements issued by Scholastic during the class period. Marchuk had access to internal corporate documents and reports relating to trade sales and return data, conversed with other officers and employees and attended management and committee meetings. He

> helped prepare the Director's Books analyzing
> data and commenting on sales trends.

Id. at 76.

Finding these allegations sufficient to state a claim for primary liability under Section 10(b), the Court of Appeals reversed the dismissal of the complaint.

Neither of the two leading Second Circuit cases – Wright and Scholastic – provide any basis for holding Angel primarily liable in the present case. Ernst & Young had a substantial involvement in the false statements involved in Wright and yet, due to the distinction the Court of Appeals was making between primary liability and aiding and abetting liability, Ernst & Young was not held liable, i.e., primarily liable. In the present case, Angel had literally no involvement in the falsifications. He did not prepare the financial figures, did not assist in the preparation of these figures, did not review these figures, and had no responsibility or authority to take any such steps or actions. As to the false signatures of the auditors, Angel had nothing to do with such falsification. If Ernst & Young could not be primarily liable in Wright, it is impossible to conceive of Angel being primarily liable in the present case.

Regarding the Scholastic decision, whatever that decision means regarding Second Circuit doctrine, the salient fact for present purposes is that there is nothing in that decision which can possibly provide grounds for holding Angel primarily liable in the present case. Angel's role in our

case bears no resemblance to Marchuk's responsibilities and activities in the Scholastic case.

The SEC attempts to distinguish Wright from the present case on the basis that Wright involved company outsiders - i.e., auditors, whereas, in the present case, Angel was an insider, a public company director. This argument is unpersuasive. Nothing in Wright suggests that its holding is limited to a particular class of defendants. Moreover, in SEC v. PIMCO Advisors Fund Mgmt. LLC, 341 F. Supp. 2d 454 (S.D.N.Y. 2004), the court applied the Wright "bright line" test to an individual defendant who was a manager, and hence an insider, of two of the mutual funds at issue. Id. at 465.

Two other cases cited by the SEC should be noted. These are SEC v. U.S. Environmental, Inc., 155 F.3d 107 (2d Cir. 1998), and SEC v. First Jersey Securities, Inc., 101 F.3d 1450 (2d Cir. 1996).

Again, even if as a theoretical matter, First Jersey Securities and U.S. Environmental were understood to blur somewhat the bright line rule set out in Wright, the outcome here would remain the same because First Jersey Securities and U.S. Environmental are readily distinguishable from the present case. The fraudulent conduct found to constitute a primary violation of Section 10(b) in First Jersey Securities and U.S. Environmental was of an entirely different and far greater quantum than was alleged in either Wright or the present case.

In First Jersey Securities the court imposed primary liability upon the defendant sole owner and chief executive officer of a brokerage house that conducted a fraudulent scheme in its sale of securities. The court found that the "magnitude of First Jersey's scheme and the degree of oversight needed to coordinate the [fraudulent] activities . . . could only have occurred at the direction of First Jersey's upper-level management" and that the defendant "was engaged in the purposeful planning of the pattern and repeated format of trading in which the respective branch offices engaged and that he 'orchestrated every facet of First Jersey's branch office network.'" 101 F.3d at 1471-72.

In U.S. Environmental, the court confronted a scheme in which the defendants manipulated upward the price of the stock of U.S. Environmental, Inc. by engaging in wash sales and "matched orders." One of the defendants, Romano, actually executed fraudulent trades of U.S. Environmental Stock in return for promises of a risk-free profit from these trades. Despite the fact that he had full knowledge that he was furthering a market manipulation scheme, Romano contended that he could not be held liable for a primary violation of Section 10(b) because he did not share the "share the promoter's ultimate 'manipulative . . . purpose to raise the stock price.'" 155 F.3d at 110. The court rejected this argument, holding that "Romano himself 'committed a manipulative act,' . . . by effecting the very buy and sell orders that manipulated U.S. Environmental's stock upward." Id. at 112.

Angel's conduct in the present case stands in marked contrast to that of the defendants in First Jersey Securities and U.S. Environmental, each of whom were alleged to have been centrally involved in the planning and execution of the fraudulent schemes at issue in those cases. Angel performed no such functions.

Count I of the complaint alleging that Angel committed a primary violation of Section 10(b) presents no triable issue. Summary judgment is granted and Count I is dismissed.

## Count II: Aiding and Abetting Violation of Exchange Act Section 10(b) and Rule 10b-5

In Central Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164 (1994), the Supreme Court held that a private action for aiding and abetting could not be maintained under Section 10(b) of the Exchange Act. Id. at 177. This ruling caused concern in Congress that the same reasoning might apply to bar the SEC, as well, from bringing actions against aiders and abettors. As a result, in the Private Securities Litigation Reform Act of 1995, Congress amended the Exchange Act to permit the SEC to pursue aiding and abetting claims in civil enforcement proceedings such as the present one. Exchange Act Section 21(e), 15 U.S.C. § 78t(e). Section 21(e) provides:

> Prosecution of persons who aid and abet violations. For purposes of any action brought

> by the Commission . . . any person that
> knowingly provides substantial assistance to
> another person in violation of a provision of this
> title, or of any rule or regulation issued under
> this title, shall be deemed to be in violation of
> such provision to the same extent as the person
> to whom such assistance is provided.

Aiding and abetting liability under Section 10(b) must be based on

a showing of three elements: "(1) the existence of a securities law

violation by the primary wrongdoer; (2) knowledge of the violation by the

aider and abettor; and (3) proof that the aider and abettor substantially

assisted in the primary violation." Armstrong v. McAlpin, 699 F.2d 79,

91 (2d Cir. 1983); In re Laser Arms Corp. Sec. Litig., 794 F. Supp. 475,

491 (S.D.N.Y. 1989).

Angel assumes, for the purposes of this motion, the existence of a

securities law violation by a primary violator, but argues that he neither

knew of the primary violation nor provided substantial assistance in its

commission.

The parties dispute the level of scienter required for aiding and

abetting liability under Section 10(b) of the Exchange Act. The SEC

contends that, because Angel, as a director, owed a fiduciary duty to the

company and its shareholders, recklessness is sufficient for the required

mental state. See Armstrong, 699 F.2d at 91; IIT, International Inv.

Trust v. Cornfeld, 619 F.2d 909, 923 (2d Cir. 1980); SEC v. Penthouse

Int'l, Inc., 390 F. Supp. 2d 344, 355 (S.D.N.Y. 2005) (holding that

recklessness was sufficient to find the defendant director liable for aiding and abetting a violation of Section 10(b) and Rule 10b-5).

Angel responds that Section 21(e), the 1995 amendment to the Exchange Act that permitted the SEC to pursue enforcement actions against aiders and abettors of securities law violations, also changed the standard of scienter set forth in Armstrong and Cornfeld, and that recklessness is no longer sufficient for the imposition of aiding and abetting liability. Angel argues that the language of Section 21(e) permits aiding and abetting liability only for the "knowing" provision of substantial assistance to a primary violator, and that recklessness, even for fiduciaries, is no longer sufficient. One court in this district has recently so held. SEC v. KPMG LLP, 03-CV-671, 2005 U.S. Dist. LEXIS 39032 at *92-95 (S.D.N.Y. December 28, 2005). See also SEC v. Moskowitz, 97-CV-7174, 1998 U.S. Dist. LEXIS 12994 at *9 (S.D.N.Y. August 20, 1998) (acknowledging that recklessness may no longer be sufficient for aiding and abetting liability under the PSLRA).

This court agrees that knowing misconduct must now be shown. Furthermore, it is obvious from what has already been said in this opinion that Angel committed no such knowing misconduct.

However, even if aiding and abetting liability could be imposed for reckless conduct, the SEC has not raised any triable issue about whether Angel acted recklessly with respect to the alleged misstatements in CKP's Form 10-KSB. The recklessness necessary to satisfy the scienter

requirement in the context of Section 10(b) claims has been defined as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Honeyman v. Hoyt (In re Carter-Wallace Sec. Litig.), 220 F.3d 36, 39 (2d Cir. 2000).

There is no evidence to suggest that Angel ignored a danger or risk so obvious that the defendant must have been aware of it. The SEC has not made the slightest showing that Angel was involved with any of the subjects – cash flow, etc. – which turned out to be falsely presented. Since he was not involved in any way with the preparation or review of the figures, it follows necessarily that he had no consciousness of any danger or risk that these figures might end up being falsified.

The SEC responds with only the most general assertions, stating that Angel must have known of material misstatements because his duties at CKP included compliance and SEC filings, and that Angel was in "constant e-mail and telephonic communication with members of the CKP team that prepared, reviewed and filed the [forms]."

But these assertions about general practices within the company are of no weight in view of the admitted particular facts about what Angel did and did not do with regard to the SEC form at issue in the present case.

The SEC also alleged that Angel "knew, or was reckless in not knowing, that CKP did not have the consent of CKP's independent auditors to file, and that the May 20 Filing lacked authentic signed independent auditor opinions."

The SEC has conceded that Angel did not have any conversations with CKP's auditors after he left the office at 6:00 p.m. Angel did receive Bukzin's 6:46 p.m. email informing him that CKP did not have Marcum & Kliegman's permission to file. However Angel's testimony, conceded by the SEC, is that he thereafter telephoned DiLorenzo who reassured him that the email "wasn't an issue." Angel's caution in seeking assurance from DiLorenzo after receiving Bukzin's email, and his subsequent reliance upon DiLorenzo's reassurance, can by no means be termed reckless.

The SEC has also failed to raise any triable issue with respect to the final element of aiding and abetting liability, the requirement that Angel "substantially assisted" in the primary violation. A defendant substantially assists a primary violation of Rule 10b-5 if his conduct is a substantial causal factor in the perpetuation of the underlying fraud. Rolf v. Blyth, Eastman, Dillon & Co., Inc., 570 F.2d 38, 49 (2d Cir. 1978). In alleging the requisite substantial assistance by the aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm on which the primary liability is predicated.

Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62-63 (2d Cir. 1985).

As stated above, the SEC has conceded that Angel's role in the preparation of the Form 10-KSB was very limited, and that Angel was not involved in preparing or reviewing the financial or accounting statements that contained the alleged misstatements or omissions. Angel's contribution to the filing was limited to gathering backup documentation for CKP's accountants and auditors, and answering questions about subsequent events and pending litigation against CKP. These facts do not support any allegation that Angel's conduct was a substantial causal factor in the perpetuation of the underlying fraud. Rolf, 570 F.2d at 49.

The SEC also asserts that Angel substantially assisted in the primary violation by presenting an incomplete and unapproved draft Form 10-KSB to Kushner for his signature as a document that was in order and "OK to sign." Angel has admitted that he presented a draft of the Form 10-KSB to Kushner, but denied making any representations regarding its accuracy or readiness for filing.

Even if Angel had made such representations, however, the SEC could not show that Angel's conduct was a substantial causal factor in the alleged primary violation. Both Angel and Kushner have stated that it was Kushner's practice to sign such documents without reading them, with the understanding that his signature would be held in reserve until all the necessary corrections were made and auditor approvals were

obtained. The SEC has not presented any evidence to the contrary. Therefore, Kushner did not sign the forms in reliance upon any alleged representations made by Angel, and would have done so regardless of Angel's assurances.

The SEC's failure to show that Angel knew or was reckless in not knowing of a primary violation, or that Angel substantially assisted in a primary violation of Section 10(b) requires that Count II of the complaint, alleging aiding and abetting claim under Section 10(b) and Rule 10b-5, be dismissed on summary judgment. There is no triable issue of fact.

## Count V: Aiding and Abetting Violations of Exchange Act Sections 13(a), 13(b)(2)(A) and13(b)(2)(B), and Rules 13a-1 and 12b-20

The same reasons for granting Angel's summary judgment motion as to aiding and abetting liability under Section 10(b) are equally applicable to the SEC's claim of aiding and abetting violations under Section 13(a). That section requires each issuer of registered securities to file "such information and documents as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement." Rule 13a-1 implements Section 13(a) by requiring issuers to file annual reports, while Rule 12b-20 requires issuers, in addition to providing information expressly required in such reports, to add such further

material information, if any, as may be necessary to make the required statements, in light of the circumstances in which they were made not misleading.

Although little case law exists with respect to the elements of aiding and abetting liabilit0y under Section 13(a), at least one circuit has evaluated such claims under the same three-part test set forth in Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983) for aiding and abetting violations of Section 10(b). See Ponce v. SEC, 345 F.3d 722, 737 (9th Cir. 2003). For the same reasons articulated above with respect to Angel's aiding and abetting liability under Section 10(b), Angel's motion as to the claim of aiding and abetting a violation of Section 13(a) is granted.

Similarly, the SEC's aiding and abetting claims under Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) must be dismissed. These provisions require issuers to keep accurate books and records and to maintain an adequate system of internal controls. There is no evidence to support the claim that Angel was responsible for CKP's books and records or for maintaining adequate controls, or that he aided or abetted any violation with respect to those requirements. Accordingly, Angel's motion for summary judgment is granted as to Count V of the complaint. Again, there is no triable issue of fact.

## CONCLUSION

Angel's motion for summary judgment is granted and the action is

dismissed as to him.

SO ORDERED

Dated: New York, New York
February 17, 2006

Thomas P. Griesa
U.S.D.J.